JUNEAU EDUCATION ASSOCIATION,
Appellant,

v.

CITY AND BOROUGH OF JUNEAU and
Board of Education of the City and Borough of Juneau, Appellees.

No. 2288.

Supreme Court of Alaska.

Aug. 29, 1975.

Peter M. Page of Gregg, Fraties, Petersen & Page, Juneau, for appellant.

Avrum M. Gross, of Faulkner, Banfield, Doogan, Gross & Holmes, Juneau, for appellees.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and FITZGERALD, JJ.

CONNOR, Justice.

This is an appeal from a summary judgment in favor of appellees. Appellant is the recognized collective bargaining agent

for the teachers employed by the city and borough of Juneau. The city and borough is represented in the collective bargaining process by its board of education.

In 1965 appellant and appellees agreed to bargain with each other, and entered into an agreement which includes recognition of appellant as the collective bargaining agent, principles to which the parties subscribe, and the procedure for negotiations. In section 5 of the agreement appears the following language:

"SALARIES AND WORKING
CONDITIONS

The schedules and policy statements attached are made a part of this agreement.

This contract shall remain in force until July 1, 1966 at eight o'clock in the morning. It will be renewed automatically for a period of one year from the expiration date each year unless one of the parties shall have notified the other at least ninety days before the expiration date that it will not accept renewal."

In following years the parties negotiated on all subjects. On February 6, 1973, the parties agreed to a variety of items, one of which was the following:

"The Board shall provide that the base salary shall be $11,400 beginning with the 1973–74 school year, however this provision eliminates negotiations during a three year period on the following items: Salary, Major Medical, Dental, Retirement, and Sick Leave. Negotiations on the above items will resume for the 76–77 School Year."

On October 5, 1973, appellees, through the president of the board of education, informed appellant by letter in part as follows:

"As you know, negotiations time is arriving. This letter is to notify you that the Board is ready to begin negotiations, and would like to start meeting with your committee in October.

The Board feels the need to review the entire negotiations agreement which is currently in effect since it has not been reviewed since 1966. So as to make the entire contract negotiable, it is first necessary that we give you formal notice of our intention not to renew that contract, and its amendments as it presently stands. Therefore, the Juneau Education Association is hereby notified that the present contract including amendments to it will not be renewed on July 1, 1974. (Paragraph V 1966 contract). This notice does not, of course, affect the salary scale which was negotiated on a three-year basis."

After this time an impasse developed in negotiations between the parties. Appellant sued for declaratory relief, with appellees counterclaiming for declaratory relief.

The superior court ruled that the contract terms were unambigious, and that the 1965 agreement and the agreements arrived at each year thereafter, including 1973, were in essence a single contract, governing the rights and responsibilities of the parties. In interpreting the contract, the court held that the 1973 agreement bound the parties for three years as to salary, major medical, dental, retirement, and sick leave, but that the balance of the matters subject to negotiation could be negotiated after July 1, 1974. Summary judgment was awarded to appellees.

The following issues are presented on appeal:

1. Whether the superior court erred in its interpretation of the contract documents.

2. Whether the court erred in awarding as costs certain expenses for discovery depositions.

3. Whether the court erred in awarding attorney's fees against appellant.

I.

Appellant argues that *McBain v. Pratt*, 514 P.2d 823 (Alaska 1973), sets forth the

principles which require reversal of the trial court's determination. In *McBain* the court was presented with a claimed conflict between a marital separation agreement and a trust instrument, which were executed on the same day. In resolving the question presented there the court stated:

"Wherever possible, repugnant portions of a contract must be harmonized. An interpretation will not be given to one part of a contract which will annul another." 514 P.2d at 828 [footnote omitted].

Appellant urges that the original durational clause in the 1965 agreement and the specific durational clause in the 1973 agreement must be harmonized. If so read, appellant claims, then so long as the entire agreement remains in effect, a moratorium exists as to negotiations. But if either party exercises its power to cancel any portion of the agreement, then the entire agreement, including any specially agreed upon moratorium, is terminated.

We are not persuaded that this is the right result. First, the *McBain* case is distinguishable in that we were there dealing with two contemporaneous instruments, not two expressions of a continuing relationship widely separated in time. Second, we must look to the rules applicable to successive, inconsistent agreements relating to the same subject matter.

Appellees rely on *Autry v. Republic Productions, Inc.,* 30 Cal.2d 144, 180 P.2d 888 (1947), for the proposition that the parties may modify an existing agreement by a later, partially inconsistent agreement. There an agreement was made in 1938 requiring Mr. Autry to perform acting services. It contained a general provision concerning the parties' rights in the event of interruption of the ability to perform services. In 1942 the parties made a supplemental contract which referred specifically to an interruption of services in the event of military service. In making a determination of the parties' rights after the war, the court stated:

"[I]f . . . the 1942 agreement was amendatory of and supplementary to the 1938 agreement, it may be said that paragraph 24 of the later agreement controlled the question of the defendant's rights in the event of the plaintiff's military service. That paragraph, being a specific provision governing the parties' rights on the happening of that contingency, is controlling over any general provision from which the defendant might have inferred some inconsistent right or privilege." 180 P.2d 892–93.

Parties to a labor or service contract are always free to amend their agreements. *Waters v. Wisconsin Steel Works of Internat'l Harvester Co.,* 427 F.2d 476, 489 (7th Cir. 1970), *cert. denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970).

And, as the court noted in *Cheney v. Rucker,* 14 Utah 2d 205, 381 P.2d 86, 89 (1963),

"It is fundamental that where parties have rights under an existing contract they have exactly the same power to renegotiate terms or waive such rights as they had to make the contract in the first place."

*Accord, McDonald Construction Co. v. Murray,* 5 Wash.App. 68, 485 P.2d 626 (1971).

In *NLRB v. Operating Engineers Local 12,* 323 F.2d 545, 548 (9th Cir. 1963), the court specifically discussed the problem of construing inconsistent contracts entered into at different times:

"Since both contracts were in force, the question arises as to which took precedence . . . . The provisions of these two contracts are inconsistent with each other and since the contracts were entered into by the same parties and cover the same subject matter, it is a well settled principle of law that the later contract supersedes the former contract as to inconsistent provisions." [citations omitted].

■ In order to effectuate the relinquishment of a collective bargaining right under the provisions of a collective bargaining agreement, the language must be clear and unmistakable. *Federal Compress & Warehouse Co. v. NLRB*, 398 F.2d 631 (6th Cir. 1968).

■ Applying the foregoing to the present case, it is apparent that the parties did agree to a modification of a portion of the collective bargaining agreement. The original durational clause, although it was incorporated in the 1973 agreement, was created prior to the 1973 contract. The 1973 agreement did not specifically endorse or reject the original clause; rather, it merely incorporated that clause as part of its reaffirmation of the master agreement as amended.

The 1973 durational clause clearly prohibited negotiations with respect to salary and related benefits for a period of three years. This provision was in direct conflict with the original durational clause. The clear intent of the parties was to exchange a promise of a substantial salary increase for a promise of a three-year moratorium on negotiations for increased and related benefits. It is not apparent from the words of the contract that appellant based its acceptance of the salary offer on an understanding that the three-year moratorium would be nullified if either party invoked its rights under the master agreement and allowed the remainder of the contract to expire.

We hold that the 1973 amendment remained in force after the appellees' letter of October 5, 1973, reopened negotiations as to the balance of the contract.

Appellant next points out that the 1973 agreement related to the 1974–75 school year and was, thus, wholly executory. The consideration for that executory agreement was the mutual exchange of promises represented by the contract as it stood upon the completion of the negotiations. Thus, urges appellant, cancellation of part of the agreement works a failure of consideration as to the whole.

Appellees contend that the board "cancelled" nothing; rather, it simply failed to renew provisions of a contract which were due to expire. Furthermore, according to appellees, the consideration for the 1973 amendment granting higher salaries was specifically a corresponding promise from appellant to forego discussions on salary for three years, not, as appellant suggests, the "entire agreement." Moreover, appellees argue, even if other provisions concerning working conditions were a part of the over-all consideration, those other agreements would be delineated by the terms of the contract under which they were created. If appellant assumed that those agreements were part of the consideration for the salary contract, it also had to assume that the provisions were limited in their duration to one year.

Our examination of the wording of the 1973 agreement regarding salary and related benefits reveals a promise by appellees to pay higher salaries to the teachers in exchange for a promise by appellant to forego negotiation on such benefits for three years. No mention is made of any reliance by appellant on the continued existence of the remainder of the contract.

The members of the association received and will continue to receive higher salaries as a result of the 1973 agreement. The parties bargained for a promise of higher salaries in exchange for a three-year moratorium. Thus, there was no failure of consideration. Assuming the 1973 amendment is enforced, each party received and will receive exactly what it bargained for when it negotiated the 1973 contract.

II.

■ The superior court awarded as costs against the appellant the entire cost of discovery depositions taken by appellees.

Appellant argues that the determination of the superior court that the contract was

to be interpreted on its face amounts to a ruling that the depositions were not necessary to the resolution of the issues before the court. Relying upon *Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967), appellant concludes that when depositions are not strictly necessary to the cause of the party taking them it is an abuse of discretion to include the expense of taking such depositions in the costs assessed against the unsuccessful party.

Appellees argue that the depositions were necessary because, in its complaint, appellant claimed that the intent of the 1973 agreement somehow differed from the language of the agreement. Thus, in an effort to understand the allegations of the complaint, as well as to view the "whole cloth" of the relationship between the parties, appellees took the depositions of the three negotiators of the association who had negotiated the 1973 agreement and who were now claiming, as present negotiators for the association, that the 1973 agreement was not binding for three years. Appellees note that the depositions were quoted extensively to the court below and that the superior court made reference to the depositions in its memorandum opinion when it held that the negotiations leading up to the agreement were additional support for the court's conclusion.

Thus, appellees conclude that, since the depositions were clearly relevant to the issues of this case, i. e., the intent of the parties, and were used in appellees' presentation to the court in resolving the issues, it was not an abuse of discretion for the court to award costs for the taking of the depositions.

*Beaulieu v. Elliott, supra,* is distinguishable. There the superior court refused to tax the losing party for the costs of certain depositions, and we upheld the lower court's decision as not amounting to an abuse of discretion. In particular we said:

"The taxing of costs rests largely in the sound discretion of the trial court, and we shall not interfere with the exercise of that discretion except in cases of abuse." 434 P.2d at 678 (footnote omitted).

The standard to be applied in ascertaining whether a court has abused its discretion was stated in *De Witt v. Liberty Leasing Corp. of Alaska,* 499 P.2d 599, 601 (Alaska 1972), as whether the determination is manifestly unreasonable.

Given the wording of the complaint filed in this case, we do not view the superior court's decision to tax appellant for the costs of depositions as so manifestly unreasonable as to amount to an abuse of discretion. On this point there is no error.

### III.

■ Appellant argues that by requiring it to pay the costs of not only its own attorneys but the attorney for the board, a public body, the superior court chose to concentrate on the shoulders of a few the entire costs of good-faith litigation to resolve an important public question. Appellant bases its argument on language contained in *Malvo v. J. C. Penney Co., Inc.,* 512 P.2d 575, 587–88 (Alaska 1973), and *Boddie v. Connecticut,* 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Since *Malvo* stands for the proposition that a successful litigant should not necessarily receive full reimbursement for attorney's fees and costs,[1] and since appellees did not receive full reimbursement, that case is not controlling. Appellant attempts to cite *Malvo* for the broader proposition that it is an abuse of discretion to award any attorney's fees to a prevailing party if such an award discourages good-faith litigation. However, the language in that case will not support such a broad reading, since it was concerned solely with the question of full reimbursement.

Appellees argue that *Malvo* is totally irrelevant and that this suit does not involve broad constitutional issues or even a mat-

1. 512 P.2d at 587.

ter of significant public interest. Therefore, appellees conclude, it was not unreasonable for the superior court to insist that those who sought to benefit personally through the litigation be required to alleviate at least partially the financial burden of the public which did nothing but attempt to abide by the terms of a clearly written agreement.

In the circumstances of this case we find no abuse of discretion in the award of attorney's fees, and no error.

Affirmed.

BOOCHEVER, J., not participating.

ERWIN, Justice (concurring).

I concur with the view expressed by the majority that appellees' letter of October 5, 1973, did not operate to terminate in their entirety the contractual relations between the parties, and that the 1973 amendment imposing a three-year moratorium on negotiations for increased wage and related benefits continued to be binding upon the parties after the October 5 notice had opened negotiations on the balance of the contract. I feel it necessary, however, to voice my concern that our decision today not be interpreted to imply that questions arising in connection with the construction and enforcement of collective bargaining agreements are always to be resolved through a simple application of principles of ordinary contract law. A proper analysis of such issues requires an appreciation of the rather unique and distinctive character of such agreements, and I consequently feel constrained to call attention to some general considerations which I find relevant to our decision today.

The Supreme Court of the United States has taken the position that collective bargaining agreements must be differentiated from ordinary contracts. In *United Steelworkers of America v. Warrior & Gulf Navigation Co.* it opined that

[a collective bargaining agreement] is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.[1]

The Court then went on to observe that such an agreement is designed to cover the "whole employment relationship" and consequently calls into existence "a new common law—the common law of a particular industry"[2] to define the contextual parameters within which the agreement is to be implemented.

A collective bargaining agreement differs from an ordinary contract in that it represents a broad-based and generalized attempt at commercial self-government. Of necessity, therefore, its scope encompasses such a vast array of people, potential conflicts, and unforeseen contingencies as to make its conformance with the analytical mold of ordinary contracts difficult if not impossible; to make the words of the agreement the exclusive source of the rights and duties of the parties is to ignore this fact.[3] It may consequently be said that a collective bargaining agreement does not define a consensual relationship in the same sense as do most contracts. It defines, rather, the general contours of the labor relationship itself and anticipates—notwithstanding specific provisions—a continuing interaction in the expectation that there will be some eventual agreement as to particular rights and duties of the parties.

In *United Steelworkers,* the Supreme Court made the following observation:

A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter into contractual relationship they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not

1. 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409, 1415 (1960).

2. *Id.* at 579, 80 S.Ct. at 1351, 4 L.Ed.2d at 1415; *accord John Wiley & Sons, Inc. v.*

*Livingston,* 376 U.S. 543, 550, 84 S.Ct. 909, 11 L.Ed.2d 898, 905 (1964).

3. 363 U.S. at 579, 4 L.Ed.2d at 1416.

between entering or refusing to enter into a relationship, for that in all probability pre-exists the negotiations. Rather it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces. The mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time. Because of the compulsion to reach agreement and the breadth of the matters covered, as well as the need for a fairly concise and readable instrument, the product of negotiations (the written document) is, in the words of the late Dean Shulman, "a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and some do little more than leave problems to future consideration with an expression of hope and good faith." . . . Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific practices which underlie the agreement may be unknown, except in hazy form, even to the negotiators.[4]

Consistent with this paradigm it has been recognized that the old common law concepts which control ordinary private contracts should not govern a collective bargaining agreement since such an agreement is not an ordinary contract for the purchase of goods and services.[5] Consequently, not only should a collective bargaining agreement be read as a whole and

in light of the law relating to it when made,[6] the court must in interpreting it be particularly mindful that it does not lose sight of the broad contextual underpinnings which support the instrument.

In our role of developing a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements, we think special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve.[7]

In the instant case I am persuaded that the history of the negotiations between the parties as well as the contextual setting attendant at the adoption of the 1973 amendment are supportive of the construction adopted by the majority opinion. Such a construction gives logical effect to the obvious purpose of the amendment as revealed by what I find to be a clear bilateral intent that a bargained-for three-year moratorium on wages was to be a condition for all other negotiations for that period. It moreover explains what would otherwise be an essentially meaningless and irrational concession by appellees under the circumstances; a provision which specifically excepts an area of negotiated agreement from normal durational limitations becomes self-contradictory if construed to be subject to renegotiation by operation of that same durational limitation. It may well be that appellees' October 5 notice was less than artfully drawn, but it cannot be said that it evinced an intent to waive or surrender the benefit of appellees' bargain or to voluntarily resubject wages to negotiation after only one year had expired. As observed by the majority our decision today assures that each party receives exactly what it bargained for.

4. *Id.* at 580–81, 80 S.Ct. at 1351, 4 L.Ed.2d at 1416.

5. *Transportation-Communication Employees Union v. Union Pac. R. R. Co.*, 385 U.S. 157, 160–61, 87 S.Ct. 369, 17 L.Ed.2d 264, 268 (1966).

6. *Mastro Plastics Corp. v. NLRB*, 350 U. S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

7. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403, 1406–07 (1960).